**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| AMY LANE, Plaintiff, | : | CASE NO. 3:26-cv-00208 |
| v. | : | |
| ERIC BRAHMS and RYAN DREXLER, Defendants. | : | FEBRUARY 10, 2026 |

## COMPLAINT

Amy Lane, by and through her attorneys, Robinson & Cole LLP, for her Complaint against Eric Brahms and Ryan Drexler (collectively "Defendants"), alleges as follows:

## NATURE OF THE CASE

1. Amy Lane is a mother of three young boys, a former high school English teacher, and a devoted advocate in the fight against breast cancer. She is also the victim of an elaborate plot by the Defendants and their co-conspirators to infiltrate and terrorize Ms. Lane, spreading lies about her family, revealing private details of her life, exposing her minor children to publicity, and causing her to fear for her safety. It is a chilling reminder that those who seek to destroy the sanctity of a person's privacy need only a twisted mind and a Wi-Fi network to render their victims helpless from their attacks.

2. For two years, Eric Brahms and Ryan Drexler, together with co-conspirators Andi Sklar and Kimberly Daunais, perpetrated a stalking and harassment campaign against Ms. Lane as

part of a vendetta against her husband—Drexler's adversary in a Nevada bankruptcy proceeding. The campaign included an anonymous poison pen letter sent to Ms. Lane that accused her husband of infidelity, warning letters sent to dozens of her neighbors falsely accusing Ms. Lane's husband of violence, phone calls to Westport school officials from an individual posing as a New York Times reporter inquiring about Ms. Lane and her children, fictitious Facebook accounts that spread alarming falsehoods about Ms. Lane's family in local community groups, harassment websites hosted on international servers that prominently featured Ms. Lane's minor children, and ultimately, the service of a frivolous subpoena on Ms. Lane on stage at a breast cancer charity event, where Ms. Lane was honoring her late mother.

3. For two years, this relentless scheme was executed with extraordinary success. Brahms and Drexler evaded detection by carefully covering their tracks, and by relying on Ms. Sklar, a Westport resident and self-proclaimed philanthropist, who they referred to as their "source." When they were finally caught red-handed, the Westport Police Department found probable cause to charge all three with stalking and harassment; charges the local prosecutor declined to bring, citing the availability of civil remedies to Ms. Lane.

4. To date, no court has adjudicated Defendants' conduct on the merits or declared what it was: an unlawful scheme designed to punish an innocent bystander and to influence a federal proceeding through fear and public humiliation. Ms. Lane brings this action to obtain that judgment, to hold Defendants accountable under federal and state law, and to ensure that the courts and litigants are not influenced by unlawful intimidation, retaliation, racketeering, and extortionate pressure.

## PARTIES

5. Amy Lane ("Lane") is an individual who resides in Westport, Connecticut.

6. Eric Brahms ("Brahms") is an individual who resides in Greenwich, Connecticut.

7. Upon information and belief, Ryan Drexler ("Drexler") is an individual who resides in Los Angeles, California. Drexler is the former CEO of MusclePharm Corporation ("MusclePharm").

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1331 because Plaintiff's federal claim, pursuant to 18 U.S.C. § 1962, arises under the laws of the United States. The Court has supplemental jurisdiction over the non-federal question claims set forth herein pursuant to 28 U.S.C. § 1367(a).

9. The Court also has personal jurisdiction over the Defendants because the transactions and occurrences out of which these claims arise transpired within the State of Connecticut.

10. The Court also has personal jurisdiction over Defendants Brahms and Drexler because they regularly conduct business within the State of Connecticut.

11. The Court also has personal jurisdiction over Defendant Brahms because he is a resident of the State of Connecticut.

12. The Court has personal jurisdiction pursuant to 18 U.S.C. § 1965, because it has jurisdiction over at least one defendant and the ends of justice require that other parties residing in other jurisdictions be brought before the Court.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to this lawsuit occurred in this district. Venue is also proper under 18 U.S.C. § 1965 because Brahms resides in this judicial district.

## FACTS

14. Ms. Lane is a resident of Westport, Connecticut.

15. Ms. Lane has been married to Ryan Lane since 2008.

16. Ms. Lane and her husband have three children.

17. Ms. Lane is not currently employed outside the home.

18. Prior to the birth of her children, Ms. Lane worked for ten years as a founding teacher in the first public high school to open in downtown Manhattan after the attacks of September 11, 2001. Ms. Lane served as the head of the English department at the school and was responsible for developing and overseeing the curriculum.

***The Harassment Campaign***

19. The vicious harassment campaign aimed at Ms. Lane started in February 2023.

20. In early February 2023, an anonymous caller purporting to be a New York Times reporter contacted individual board members of the Westport Board of Education from a blocked phone number.

21. In this phone call, the anonymous caller, a male, inquired about Ms. Lane, her husband, and her children.

22. Ms. Lane learned of this call through various sources, including through friends on the Westport Board of Education.

23. Ms. Lane also received a call from the Westport superintendent of schools informing her of the bizarre calls.

24. Ms. Lane became disturbed at the notion of an anonymous individual inquiring with the Westport Board of Education about her, her children, and her family.

25. On or about February 17, 2023, Ms. Lane received an anonymous handwritten letter post marked from New York City (the “Poison Pen Letter”).

26. This letter purported to be from Ms. Lane’s husband’s alleged mistress and alleged that Ms. Lane’s husband had been unfaithful for over a year.

27. The Poison Pen Letter purported to tell Ms. Lane of the “kind of man” her husband was.

28. The Poison Pen Letter also claimed that the author “had been seeing [Ms. Lane’s husband] for about a year with promises of a life and future together.”

29. An image of the envelope in which the Poison Pen Letter was sent is below:




30. An image of the contents of the Poison Pen Letter is below:



Amy,

This is probably the last type of letter you would ever want to receive but, I feel you have the right to know what type of person your husband Ryan is.

I'm not sure what type of relationship or arrangement you two have but, from what I've experienced with Ryan it isn't ideal.

I was seeing Ryan for about a year with promises of a life and future together.



Promise after promise things never seemed what they promised to be. I couldn't take the lies and broken promises anymore, so I ended our relationship.

You have a right to know how "trustworthy" and "loyal" you husband is.

I'm sorry to write this type of letter to you but also not for being honest.

Best of luck to you.

C.

31. The two anonymous attacks within a few weeks distressed Ms. Lane.

32. Approximately six weeks later, on or about April 1, 2023, Ms. Lane discovered that all her neighbors on her street, which has more than thirty homes, received anonymous flyers via U.S. Postal Mail (the "Warning Flyers").

33. The envelopes containing these flyers were also postmarked from New York City and the handwriting on the envelopes was strikingly similar to the handwriting on the envelope containing the Poison Pen Letter. The return address was one block away from the return address listed on the Poison Pen Letter.

34. An image of one of the envelopes is below:




35. The Warning Flyers contained information about Ms. Lane's husband's arrest six years prior, which was the result of a severe health incident that Ms. Lane suffered while dining at Tarantino Restaurant. A screenshot of the flyer received by Ms. Lane's neighbors is below:

> Ryan Matthew Lane lives at 14 Manitou Rd. Westport.
>
> Get to know your neighbor. He was arrested at Tarantino's Restaurant & Bar and then tried to get his arrest sealed by the court.
>
> Get to know your neighbor. 1.Charge Criminal breach of peace 2nd degree. 2.Charge Criminal Interfere with Officer/Resisting.

36. This information is not publicly available because the charges brought against Mr. Lane were dropped and the charges and record were expunged.

37. Ms. Lane was humiliated by the transmission of the Warning Flyers and anxious about what kind of attack was going to come next.

38. Unfortunately, the harassment continued only a few days later.

39. On or about April 4, 2023, Ms. Lane learned of multiple Facebook posts by an individual, purporting to be named Wendy Bloom, concerning her family.

40. The first post was published in a group called "Westport & Fairfield Parents CT".

41. Upon information and belief, the "Westport & Fairfield Parents CT" group had approximately 12,000 members.

42. The account supposedly associated with Wendy Bloom posted about the above-mentioned Warning Flyer and purported to express concern about this flyer.

43. The Wendy Bloom Facebook post stated that she lived on Ms. Lane's street, had two small children, and felt concerned because of receiving the anonymous flyer.

44. A screenshot of the post is below:




45. Another post was made in a different Facebook group, called "Fairfield & Westport Ct Parents." A screenshot of the post is below:


Fairfield & Westport Ct Parents
Wendy Bloom · 1h ·

Hi everyone. I posted on another Westport group and received several private messages suggesting I join the parents group and mention a recent situation. We live on Manitou Rd in Westport. We received an anonymous letter in the mail mentioning that one of our neighbors, Ryan Lane, was arrested and had a criminal history. Having 2 small children and living on the same street got me concerned. I was contacted by a couple other people on the street who also received the same letter. If anyone can give me some feedback on this man I would be most appreciative. Let me state that the letter did not state his crimes were sexual in nature, but more of a drunken and violent charge. Regardless it has me concerned. Any private messages will remain confidential. Thanks everyone..

2 comments

Like Comment Send

46. Similar posts were included in a group called "Westport Front Porch."

47. Notably, upon information and belief, no individuals by the name Wendy Bloom lived on Manitou Road in Westport, Connecticut, in 2023, nor have any individuals by the name of Wendy Bloom lived on that road since.

48. Ms. Lane, who knew that no one by the name of Wendy Bloom resided on Manitou Road, became further distressed by the fact the anonymous person and/or people were pouring so much time and effort into harassing her and her family.

49. Ms. Lane became further distressed by the fact that she did not know what attack was coming next.

50. Approximately a week later, on April 14, 2023, a person purporting to be Wendy Bloom and using the email address bloomwendy452@gmail.com reached out to the Westport Board of Education via email also claiming she received a Warning Flyer.

51. The email further purported to be concerned about Ms. Lane's husband and the alleged risk of violence he posed to the community.

52. A screenshot of the email is below:

**From:** wendy bloom[bloomwendy452@gmail.com]
**Sent:** Fri 4/14/2023 1:53:29 PM Eastern Daylight Time
**To:** lgoldstein@westportps.org[lgoldstein@westportps.org]; lheyer@westportps.org[lheyer@westportps.org]; nphillips@westportps.org[nphillips@westportps.org]; kchristie@westportps.org[kchristie@westportps.org]; dhordon@westportps.org[dhordon@westportps.org]; chtorres@westportps.org[chtorres@westportps.org]; westportspedpta@westportps.org[westportspedpta@westportps.org]; whspa02790@gmail.com[whspa02790@gmail.com]
**Subject:** [External] Westport Resident Ryan Matthew Lane

To Whom It May Concern,

I am writing this email and sending it to various members of the school district in an effort to inform the board members about a local resident. I received an anonymous letter in the mail regarding Mr. Ryan Matthew Lane of Westport. The letter stated that Mr Lane was arrested in town for aggravated assault and resisting arrest. I have two small children and live on the same street as Mr Lane (Manitou Rd).I am concerned about not only the arrest record, but the violence surrounding it as well as resisting arrest from local law enforcement. I cannot verify these charges, but I felt it only prudent to inform the local school board as Mr Lane has young children in the district as do I. At the very least the behavior should be documented in the event that something happens involving Mr Lane in the future. I am not writing to alarm anyone, but I felt a responsibility to inform "someone" in case Mr Lane acts violent or erratic in the future. Sincerely, Wendy Bloom

53. Upon conducting research, Ms. Lane discovered that the name Wendy Bloom and the corresponding Facebook page picture seemed to match the profile of an attorney in the Chicago area who was employed at the law firm of Kirkland & Ellis.

54. When contacted, the real Ms. Bloom confirmed that she did not create the Facebook account that posted about Ms. Lane's family and that she was not the owner of the email address bloomwendy452@gmail.com.

55. Ms. Bloom stated she did not, nor had she ever, lived in Connecticut.

56. Ms. Bloom further confirmed that it was her picture and that she did not authorize the creation of these accounts or the use of her picture.

57. Ms. Bloom further confirmed that she was not involved and did not know about the Facebook post or email.

58. Put simply, an anonymous person was impersonating Ms. Bloom.

59. Less than nine months later, the harassment continued.

60. On or about January 5, 2024, Ms. Lane was made aware of the website www.ryanlanewestport.com ("Harassing Website 1"), which displayed private information about her and her family, and displayed Ms. Lane's personally identifying information.

61. Harassing Website 1 was dedicated to posting damaging, embarrassing, false, and/or private information concerning Ms. Lane and/or her family.

62. Among other things, Harassing Website 1:

(a) Published a picture of Ms. Lane, her husband, and their three minor children, all under the age of 13 at the time;

(b) Directly quoted a private email Ms. Lane sent concerning a charitable contribution;

(c) Published false statements that Ms. Lane and her children were abused by Ms. Lane's husband. The public website specifically stated that "[Mr. Lane] verbally abuses his wife and children both privately and publicly."

63. Harassing Website 1 also contained information related to Ms. Lane's husband's prior arrest, and other false and defamatory statements concerning Ms. Lane's husband, including false statements that he had been kicked out of a country club, the Patterson Club, of which Mr. Lane was never even a member.

64. Harassing Website 1 also disclosed Ms. Lane's name, her prior legal name, her maiden name, her month and year of birth, her phone number, her address, and her prior addresses, among other sensitive private information.

65. The picture of Ms. Lane, her husband, and her three children published on Harassing Website 1 was one of the few family photos that Ms. Lane ever posted on her Facebook page.

66. Ms. Lane's privacy settings on Facebook were such that only "friends" could see photos.

67. Ms. Lane does not maintain public social media accounts; therefore, in addition to being distressed about the content posted on the website, Ms. Lane also became severely distressed that someone with close access to her was leaking her private information, including pictures of her minor children.

68. Additionally, Harassing Website 1 directly quoted an email that Ms. Lane sent to only two people on September 5, 2023: the co-chairs of a fundraising event for a charity called the Pink Aid Foundation ("Pink Aid"). One of the co-chairs was Andi Sklar.

69. A screenshot of the email that was sent to only two addresses is below:



**From:** **Amy Lane** gladamy@gmail.com
**Subject:** deer valley donation
**Date:** September 5, 2023 at 12:12 PM
**To:** Abbie Manning abbiemanning1@gmail.com, Andi Sklar andis@pinkaid.org

Hi guys!
I want to make sure we have everything laid out for our donation as Ryan (husband) was just asking me some questions so I want to make sure we have the conversations now and that I didn't miss anything on the donation form.

The biggest thing is that this is our private family home that we don't rent out - so we are not comfortable having this sent out in an email blast for anyone around the country to bid on. I was sort of thinking that whoever bids will be one degree away from us - someone will know them. That said, I am also not sure that it would be right for the live donation - that's up to you guys. So here are the questions we have:

1) I just want to confirm that this will NOT be advertised on big email blasts that go out to people not attending the event? I know I had this conversation with some people early on, but I don't remember who and I just want to make sure I'm following up. Is there a way to include it even in the silent auction that will be visible that day but NOT online for anyone and everyone to see?

2) How do we set the minimum bid? This is worth it if Pink Aid makes a lot of $$ from it :).

3) Is there some type of security deposit that goes along with this type of donation to insure that we are not going to be stuck with any type of bad situation?

4) What happens in the (probably unlikely) event that there is an issue with the bidder before they use it. - like they are difficult or seem shady or something? Have you guys ever had issues with this sort of thing? Again. - this is why it feels so important that we don't offer this in a blast email for anyone to buy - I hope you guys understand! I want to make sure the bidder is the person who actually uses the unit - they can't give it away to someone we haven't vetted.

Let me know if you want to chat at any point. I certainly don't want to make things more difficult for you AT ALL. I also have Ryan in my ear making sure I am doing this properly...

Thanks!
Amy Lane

70. One component of the Pink Aid fundraising event was a public auction.

71. To support the organization and the event, Ms. Lane discussed with the co-chairs of the event the possibility of donating use of her vacation home in Deer Valley, Utah, for the auction.

72. As a follow-up to the discussion, Ms. Lane sent the above-mentioned email regarding the parameters around the donation of the vacation home.

73. Ms. Lane does not rent her vacation home out, so the home was not set up to be used by anyone else other than Ms. Lane's close family and friends.

74. Because Ms. Lane does not rent the vacation home and had never previously opened it for use by unknown individuals, she reasonably sought to ensure that the property would be respected, maintained, and properly cared for during any temporary use.

75. Therefore, in the email Ms. Lane expressed her family's desire to remain anonymous and asked that the home only be advertised for donation at the live local event, rather through mass email or social media.

76. Ms. Lane also took pictures of the inside of her home to help with the efforts to raise money for Pink Aid, and she sent the pictures to the co-chairs of the Pink Aid charity event, including Sklar.

77. Contents of this email and the private pictures were published on Harassing Website 1. The email, however, was misconstrued and used to suggest Ms. Lane and her family were not charitable and were attempting to keep out the "riff raff".

78. The publication of this email and pictures on Harassing Website 1, which was only sent to two people—Sklar and the one other Pink Aid co-chair—who Ms. Lane did not believe at the time had any reason to attack her, made Ms. Lane paranoid that her email account was hacked.

79. Given the information that was included on Harassing Website 1, including the private email, the pictures of her vacation home, and the picture of Ms. Lane and her family from her private Facebook account, Ms. Lane became paranoid that, in addition to her email account being hacked, her Facebook account had been hacked.

80. Ms. Lane felt violated and exposed.

81. Ms. Lane hired and worked with a security specialist who helped her change her passwords, look at her user history, and set up a monitoring system.

82. Ms. Lane also worked with an IT specialist who showed her how to protect her passwords.

83. Ms. Lane spent dozens of hours going through her accounts and emails to attempt to figure out how the person and/or people who were harassing her were accessing her information.

84. Ms. Lane made efforts to have Harassing Website 1 taken down.

85. Harassing Website 1 was eventually taken down in or around mid-March 2024, but re-appeared shortly thereafter.

86. On or about March 26, 2024, a second harassing website was published with substantially the same content at URL: http://www.ryanmatthewlane.com ("Harassing Website 2") (together with Harassing Website 1, the "Harassing Websites").

87. The Harassing Websites remained published through December 2024.

***Noticing Ms. Lane's Deposition***

88. On or about October 22, 2024, much to Ms. Lane's surprise, she learned that her deposition had been noticed in a bankruptcy proceeding pending in the U.S. Bankruptcy Court, District of Nevada, *In re: MP Reorganization*, No. 22-14422 ("Nevada Bankruptcy Proceeding"),

89. The deposition was noticed by Ryan Drexler, former CEO of Debtor MusclePharm, a publicly traded nutrition company, in the Nevada Bankruptcy Proceeding.

90. Empery Asset Management ("Empery") is a New York-based hedge fund founded in 2008 by Ms. Lane's husband, Ryan Lane. Empery was a senior secured lender to MusclePharm in the Nevada Bankruptcy Proceeding and also the collateral agent for all the lenders.

91. Drexler was subsequently charged by the SEC with fraud in connection with his management of the MusclePharm, in an action titled *SEC v. Drexler*, No. 2:23-cv-05102 (C.D. Cal. June 27, 2023).

92. Because of Empery's involvement with MusclePharm, Mr. Lane became one of Drexler's primary opponents and among other things, testified against Drexler in the SEC proceeding.

93. While Ms. Lane was aware that her husband's company was involved in the Nevada Bankruptcy Proceeding, Ms. Lane was not involved in her husband's company, nor did she have any knowledge regarding the substantive claims in the Nevada Bankruptcy Proceeding or the SEC proceedings.

94. Ms. Lane was not, and is not, employed by Empery, nor has she ever been.

95. Ms. Lane does not consult for Empery, nor has she ever consulted for Empery.

96. Ms. Lane is not involved in Empery's business affairs, nor has she even been involved in Empery's business affairs.

97. Ms. Lane has never met or spoken to Drexler, or anyone employed by MusclePharm.

98. For all these reasons, Ms. Lane was surprised Drexler had noticed her deposition in the Nevada Bankruptcy Proceeding.

99. Tellingly, this was the first—and only—deposition that Drexler noticed in the bankruptcy litigation at the time and for months thereafter, even though Ms. Lane lacked any knowledge of Empery's affairs or MusclePharm's bankruptcy.

100. Not even Ryan Lane had been subpoenaed for a deposition in the Nevada Bankruptcy Proceeding.

101. On October 24, 2024, at approximately 11 a.m., Ms. Lane's counsel conferred with Drexler's counsel regarding the notice of deposition.

102. When questioned, Drexler's attorney could not explain how Ms. Lane's testimony was relevant and simply responded that her deposition was "important to Mr. Drexler personally."

103. During the conversation, Drexler's attorney did not make the customary request that Ms. Lane's attorney accept service or that she waive service. While this at first seemed like a minor oversight, it concealed a darker purpose: Drexler and his associate, Eric Brahms (who was unknown to Ms. Lane at the time) intended to use service of the subpoena to humiliate and intimidate Ms. Lane.

***Pink Aid, An Evening of Compassion and Fashion***

104. While Ms. Lane's attorney was speaking to Drexler's attorney, Ms. Lane was preparing to co-host an event for Pink Aid. This is the very same organization to which Ms. Lane had offered her Deer Valley home for an auction, triggering ridicule on the Harassing Websites.

105. Pink Aid is a non-profit organization based in Westport, Connecticut, that provides compassionate support, critical resources, and emergency financial assistance to breast cancer patients and their families during a time of family hardship.

106. Pink Aid supports breast cancer patients and their families by providing groceries, clothing, rent, counseling, and other everyday essentials, to help alleviate the stress of everyday life, so that they can focus on beating breast cancer.

107. Every year Pink Aid hosts an annual fashion show charity event.

108. The 2024 Pink Aid event was being held on the evening of October 24, 2024, at Mitchell's Department store in Westport, Connecticut.

109. Earlier in 2024, Ms. Lane was asked by current Pink Aid presidents to host the upcoming event.

110. Sklar had co-chaired the Pink Aid events the previous two years, in 2022 and 2023.

111. Pink Aid's mission of supporting families through breast cancer diagnoses was, and continues to be, a cause important to Ms. Lane.

112. Ms. Lane was reluctant to take on a public-facing role given the harassment she had been experiencing over the previous 18 months.

113. Nevertheless, Ms. Lane agreed to take on this role in part to honor the memory of her late mother who died of breast cancer.

114. Ms. Lane devoted approximately eight months and countless hours to organizing the Pink Aid event.

115. The Pink Aid event was sold out, and six hundred people were expected to attend.

116. Ms. Lane's role as co-chair of the Pink Aid event required Ms. Lane to be at Mitchell's Department store early to set up and rehearse her speaking roles.

117. On the day of the event, October 24, 2024, Ms. Lane arrived at Mitchell's Department store at approximately 5:35 p.m.

118. Upon arrival, Ms. Lane started rehearsing her speaking role, which, among other themes, honored her late mother and included introducing the breast cancer survivors who would walk the runway in the fashion show that evening.

119. There were approximately fifty people in the room.

120. As the event was about to begin, Ms. Lane was on stage standing at the podium next to a director of Pink Aid and her co-chair.

121. Ms. Lane's co-chair, other executives, and dozens of support staff and survivors were also in the room.

122. As Ms. Lane was reading the names of breast cancer survivors, a process server, named Eric Rubin ("Rubin"), served Ms. Lane with a subpoena along with the notice of deposition in the Nevada Bankruptcy Proceeding mentioned in paragraph 88. (Hereinafter, the "Subpoena").

123. As Rubin handed her the Subpoena, he said "congratulations."

124. Ms. Lane was shocked and embarrassed by this public spectacle.

125. Ms. Lane suffered from the humiliation of being served with legal process in a room with her peers at Pink Aid, the event staff, the store staff, donors, and survivors.

126. Ms. Lane recognized Rubin as the same person who had come to her house less than a year ago to serve papers on her husband as part of the SEC matter against Drexler. On that evening, Ms. Lane accepted service because Mr. Lane was not home.

127. Publicly serving Ms. Lane was particularly egregious and unwarranted because:

(a) Ms. Lane had absolutely no knowledge relevant to the Nevada Bankruptcy Proceeding, nor has Drexler ever provided a *legitimate* reason for wanting to take her deposition;

(b) Drexler's attorney was aware that Ms. Lane was represented by counsel and had been in contact with him that same morning and did not ask him to accept service, nor did he make any mention whatsoever regarding service;

(c) Rubin, the process server that served Ms. Lane the night of the Pink Aid event, had served Ms. Lane's husband by providing service papers to Ms. Lane approximately one year prior at her home, so he therefore knew where she lived and how to serve her privately; and

(d) The Subpoena was not valid in any event in that it set the location to "Zoom" which is not proper under the Federal Rules of Civil Procedure.

(e) The Bankruptcy Court "did not have any hesitation" in quashing the subpoena because it could not find "anywhere" even a "suggestion" of relevance, and the Bankruptcy Court additionally sanctioned Drexler for Ms. Lane's costs and fees incurred in connection with the irrelevant subpoena.

***The Harassment Campaign Caused Ms. Lane Severe Distress***

128. The almost two-year harassment campaign launched against Ms. Lane caused her severe mental anguish, stress and anxiety.

129. As a result of the harassment, Ms. Lane lost significant weight due to her overwhelming anxiety.

130. As a result of the harassment, Ms. Lane had difficulty sleeping and eating for several months.

131. As a result of the harassment, for a significant period of time, Ms. Lane would wake up in the middle of the night with raging anxiety concerning the anonymous attacks and fearful of what was coming next.

132. As a result of the harassment, Ms. Lane became paranoid because of these targeted attacks and the fact that her private information was being leaked.

133. As a result of the harassment, Ms. Lane limited her social interactions for a significant period of time.

134. As a result of the harassment, Ms. Lane also had anxiety concerning the safety of her three minor children, who at the time the harassment started were 10, 11 and 13 years old.

135. As a result of the harassment, Ms. Lane constantly questioned who she could trust and was afraid to go into public.

***An Alarmed Ms. Lane Discovers Eric Brahms' Involvement in the Harassment Campaign and that Brahms is Friends With Andi Sklar***

136. Text messages produced by the process server, Rubin, revealed that Defendants Drexler and Brahms spearheaded service at the Pink Aid event.

137. Ms. Lane had never heard of Brahms before learning of his involvement in the unlawful subpoena, thanks to the text messages produced by the process server.

138. Through a simple Google search Ms. Lane discovered that Brahms was a convicted felon, exacerbating her stress about the harassment campaign, now that she knew a felon was involved.

139. Through her own research, Ms. Lane also discovered that Sklar followed Brahms' wife, Emily Brahms, on social media, and that the two appeared in several photographs together at charity events.

140. Ms. Lane accordingly determined that Sklar knew Brahms and might have relevant information about him and his involvement in the harassment.

141. Ms. Lane also recalled that her email about her family's Deer Valley home—which later appeared verbatim on the Harassing Websites—was sent only to two women, one of which was Sklar.

142. Because Sklar is a mother, just like Ms. Lane, and was also involved in Pink Aid, Ms. Lane believed that Sklar would be willing to help her and provide information during her time of need.

143. On November 13, 2024, Ms. Lane had her lawyer, Andrew Gladstein, who had successfully moved to quash the subpoena one day prior, call Sklar. Mr. Gladstein is a litigation partner at a New York City law firm and is also the brother of Ms. Lane.

144. Mr. Gladstein began the conversation by explaining that he is a lawyer who represents Amy Lane, and was calling to see if she had any information that could help Ms. Lane.

145. Mr. Gladstein proceeded to describe the vicious harassment campaign waged against Ms. Lane.

146. Mr. Gladstein also explained that he recently learned about Brahms' involvement in the unlawful service of Ms. Lane at the Pink Aid event, and that he knew Sklar was friends with Brahms.

147. Mr. Gladstein accordingly asked Sklar if she had ever provided any information to Brahms about the Lanes, or if Brahms had ever asked about the Lanes.

148. Sklar responded that she had "never" provided any information about the Lanes to Brahms, even unintentionally, and that Brahms had "never" asked about the Lanes, even in passing.

149. Sklar further opined that Eric Brahms is a good person, despite his felony conviction.

150. Mr. Gladstein provided Sklar with the web address to the Harassment Websites and asked her to pull one of the websites up while they were on the phone.

151. Sklar confirmed to Mr. Gladstein that she was viewing a Harassing Website on her phone during the conversation, and acknowledged how terrible it was that such a website existed.

152. Mr. Gladstein explained to Sklar that Ms. Lane's email, offering her Deer Valley home for the Pink Aid auction, was sent only to Sklar and one other woman, and forwarded along to a few other women, and yet its contents appeared on the Harassing Website.

153. Nevertheless, Ms. Sklar denied involvement.

154. Ms. Sklar further expressed that she was saddened to hear about the harassment waged against Ms. Lane, and she asked Mr. Gladstein if she could call Ms. Lane.

155. This conversation between Mr. Gladstein and Sklar lasted approximately 40 minutes.

156. Sklar subsequently called Ms. Lane that afternoon to express that she was appalled and saddened to hear about the harassment campaign.

157. Sklar told Ms. Lane about her conversation with Mr. Gladstein earlier in the day, stating, "wow he is a great brother and a great lawyer."

158. Sklar repeated to Ms. Lane that Emily and Eric Brahms are good people, despite Eric Brahms' previous felony conviction, and assured her that neither had ever asked questions about the Lane family.

159. When Ms. Lane stated that she would eventually find out who was harassing her family, however, Sklar harshly retorted that she felt like Ms. Lane was accusing her of involvement.

160. The conversation between Ms. Lane and Sklar lasted approximately 45 minutes.

161. Despite the length of the conversation, Sklar's purported shock at the harassment campaign, and Sklar's knowledge that the private Lane family photograph (including Ms. Lane's minor children who were at the time under the age of 13) and Deer Valley home offer were present on the Harassing Websites, Sklar failed to mention to Ms. Lane that she had provided information to Brahms concerning the Lanes.

162. In fact, she promised Ms. Lane that she had never spoken to either Emily or Eric Brahms about the Lane family.

163. Ms. Lane left the conversation feeling further distressed because what she thought was a lead to discover the perpetrators of the campaign had led nowhere—and could not sleep for several nights afterwards.

164. Ms. Lane felt that she had reached another dead end in her endeavor to find out who was harassing her family, and felt as though she angered Sklar in asking her if she had any knowledge about how the information ended up on the Harassment Website, and worried she may have interpreted her question as an accusation.

165. Thankfully, the process server's text message production, and the consequent discovery of Brahms' involvement, would soon allow Ms. Lane to discover the perpetrators of the harassment campaign.

***The Group Working Together to Execute the Harassment: Drexler, Brahms, Sklar, and Daunais***

166. Text messages produced by the process server, Rubin, revealed that Defendants Drexler and Brahms were involved in setting up service at the Pink Aid event.

167. Brahms and Drexler have been friends for over thirty years.

168. Brahms and Drexler met in Boston, Massachusetts, where they went to college.

169. Brahms is a watch dealer and runs an unlicensed hard-money lending business, Mae Capital LLC ("Mae Capital"), located at 15 East Putnam Ave, Greenwich, Connecticut.

170. Upon information and belief, on or about October 31, 2022, Brahms and/or Mae Capital loaned Drexler $500,000 at a 20% interest rate ("First Loan").

171. Upon information and belief, the First Loan was funded by Mae Capital.

172. Upon information and belief, on or about August 25, 2023, Brahms and/or Mae Capital loaned Drexler $300,000 at a 2% interest rate ("Second Loan").

173. Upon information and belief, the Second Loan was funded by Mae Capital.

174. The Second Loan was guaranteed by Drexler with four high end watches posted as collateral.

175. Upon information and belief, Drexler and Brahms and/or Mae Capital amended the Second Loan to provide for an additional $125,000. The amendment required for Drexler to provide as collateral three additional watches.

176. Upon information and belief, this additional amount was funded by Mae Capital.

177. Upon information and belief, Drexler agreed to defend and indemnify Brahms in the proceedings related to the harassment of Ms. Lane.

178. Brahms has previously been convicted of a felony and served prison time for his involvement in a twenty-eight-person credit card fraud scheme to which he pled guilty to various charges.

179. Brahms is a longtime friend of Sklar and her husband, Scott Sklar.

180. Upon information and belief, Brahms and Scott Sklar have been friends for approximately 35 years.

181. Brahms has admitted that his only source of knowledge concerning Ms. Lane was Andi Sklar.

182. Kimberlea Daunais, at the time of the harassing events, was engaged to Ryan Drexler.

183. Through the engagement of various experts and information produced through subpoenas and/or depositions, Ms. Lane was able to connect each of the harassing events described in paragraphs 19 through 127 to Drexler and/or Brahms and/or Sklar and/or Daunais.

***Brahms' Perjury and Attempts to Spoliate Evidence of Brahms', Drexler's, and Sklar's Harassment of Ms. Lane***

184. On November 14, 2024, immediately after discovering Brahms' involvement in the unlawful service upon Ms. Lane, Empery issued a subpoena to Brahms to take his deposition and demanded a production of his communications and other relevant documents.

185. On November 26, 2024, after various attempts by Brahms to evade service, including calling the police and accusing a process server of trespassing, Empery was forced to file a motion in the Nevada court to make alternate service to serve Brahms.

186. On November 26, 2024, Brahms filed a motion to quash before the Southern District of New York.

187. On or about November 27, 2024, Brahms visited Drexler in Malibu for Thanksgiving. Brahms and Drexler spent three days together over Thanksgiving weekend, and

Brahms did not visit any other people in California during the trip. Brahms' wife Emily documented this trip on social media.

188. On November 30, 2024, the Southern District of New York denied Brahms' request to quash the subpoena and compelled Brahms to appear at his deposition.

189. On December 2, 2024, Brahms produced certain text messages from his cell phone and certain emails.

190. The text messages between Brahms, Drexler, and the process server were deleted.

191. Brahms admitted he destroyed all communications with the process server.

192. On December 3, 2024, Brahms' counsel agreed to run a search on Brahms' iCloud backup. Unknown to Brahms, additional documents were produced by this method on the evening of December 3, 2024.

193. Upon review of the iCloud backup, it was revealed that thirty-eight (38) text messages that were deleted and not produced were on the iCloud back up (hereinafter "Deleted Text Messages"). These text messages included messages in which Drexler and Brahms conspired to harass the Lanes, and they included messages to and from Sklar concerning Ms. Lane and her family.

194. Less than 16 hours after receiving the Deleted Text Messages, Brahms's deposition began.

195. During the deposition, Brahms testified under oath for several hours that he had nothing to do with the harassment of Ms. Lane, not knowing that his counsel had produced the Deleted Text Messages the evening before, which unequivocally showed Brahms spearheading the harassment.

196. Towards the end of the deposition, Brahms was shown the Deleted Text Messages.

197. Brahms—clearly distraught and sweating—proclaimed "Here's your smoking gun."

198. Brahms' counsel demanded a recess shortly thereafter, and Brahms contacted Drexler.

199. Brahms then proclaimed that he would rather go to jail for crimes rather than testify against his longtime friend.

200. Brahms returned to the deposition and invoked his Fifth Amendment privilege against self-incrimination to all remaining questions.

201. Tellingly, the Deleted Text Messages revealed that Brahms, Drexler, and/or Sklar were involved in all the above-mentioned harassment.

202. After the deposition, Brahms admitted that he had control over the Harassing Websites and agreed to take down the Harassing Websites.

203. The day following the deposition, on December 5, 2024, the Harassing Websites were taken down.

204. Brahms also asked Empery's counsel to ensure that his friend Sklar not suffer legal consequences because of his perjury, despite the Deleted Text Messages proving that Sklar shared important information about the Lanes to facilitate the harassment campaign.

205. Sklar had at least three phone conversations with Mr. Gladstein after Brahms' deposition, where she continued to deny involvement in the harassment campaign beyond what had been proven during Brahms' deposition—which already belied her prior assurances of non-involvement—and she further stated that she did not know Ms. Lane would be served at the Pink

Aid event. Notably, at this point Empery had not yet discovered Sklar's communications to Brahms setting Ms. Lane up for service.

206. Even after being caught red handed, the Defendants were not done. Approximately one week after the deposition, Brahms sent a WhatsApp message to Drexler about a plan to use their newspaper contacts to "Fuck [Mr. Lane] for life." Brahms told Drexler, "I think if we can get a filing in front of Judge Moreno that we can then use our newspaper contacts to 'pull' the submission from the court documents and make a press release or Page Six post regarding Hedge Fund CEO Ryan Lane accused of witness intimidation and improper use of subpoenaed evidence. Even if we settle, win or lose, it will be out there and Fuck him for life."

207. Following Brahms' deposition, Empery subpoenaed Sklar to take her deposition and also produce relevant documents.

208. Sklar's attorney represented to Mr. Gladstein that Sklar no longer had responsive documents because Sklar—tellingly—deleted her text messages with Brahms discussing the Lanes.

209. Upon information and belief, if Sklar had been oblivious to her role in the harassment campaign, her text messages with Brahms would have been evidence in support of her innocence.

210. Sklar's attorney also represented that a deposition would be futile as Sklar was likely to invoke her Fifth Amendment rights in response to any relevant questions.

***The Investigation into the Harassment and Direct Links to the Defendants***

211. The service of the Subpoena on Ms. Lane at the Pink Aid event and subsequent investigation and document productions, including the documents Brahms intended to spoliate,

confirmed that the harassment Ms. Lane had been experiencing over the previous two years was being directed by Drexler and Brahms, and it also revealed that Drexler's contacts and/or their contacts, including Brahms, Sklar, and Daunais, were assisting and/or spearheading many of the instances of harassment.

212. Further investigation confirmed their involvement, as more fully detailed below.

***Putting the Pieces Together: The Poison Pen Letter***

213. Upon information and belief, Drexler's fiancé, Kim Daunais, wrote the Poison Pen Letter.

214. Upon information and belief, Drexler and Brahms directed Daunais to draft this letter.

215. Upon information and belief, Drexler and Brahms arranged for the Poison Pen Letter to be sent to Ms. Lane.

216. Upon information and belief, Drexler and Brahms directed the drafting and transmission of the letter for the purpose of harassing Ms. Lane and causing her significant distress.

217. Upon information and belief, Ms. Daunais' handwriting was contained on a testamentary will produced in the Nevada Bankruptcy Proceeding ("Drexler Will").

218. Drexler confirmed at a deposition in the Nevada Bankruptcy Proceeding that he believed the handwriting on the Drexler Will was Ms. Daunais' handwriting.

219. A screenshot of the portion of the Drexler Will believed to display Ms. Daunais' handwriting is below:



IN WITNESS WHEREOF I have hereunto set my hand and seal this ____ day of December, 2007.

(L.S.)
HALBERT DREXLER

WE HEREBY CERTIFY that the foregoing instrument was on the day and date hereof signed, sealed, published and declared by HALBERT DREXLER, the Testator, as and for his Last Will and Testament, in our presence, who, at his request, in his presence and in the presence of each other, have subscribed our names hereto as witnesses to the execution thereof, believing said Testator, at the time of so signing, to be of sound mind and memory.

Halbert Drexler residing at one S County Rd
Palm Beach FL 33480-4023

Kim Downs residing at 9199 Thrasher Ave.
Los Angeles CA 90069

220. A handwriting expert has confirmed that there is a "strong possibility" that the handwriting on the Poison Pen Letter belongs to the person who wrote on the Drexler Will in the screen shot above.

221. Below is an excerpt from his handwriting analysis:




***Putting the Pieces Together: The Warning Flyers***

222. Upon information and belief, Drexler directed the Warning Flyers to be sent to Ms. Lane's neighbors for the purpose of harassing her.

223. Upon information and belief, Brahms submitted a request under the Freedom of Information Act to the Westport Police Department for Ryan Lane's records on or about March 2, 2023.

224. Upon information and belief, Drexler directed his fiancé, Daunais, to address the envelopes which contained the Warning Flyers.

225. The same handwriting expert mentioned above also confirmed there is a "strong possibility" that the person who wrote on the Drexler Will (i.e. Daunais) also wrote the addresses on the envelope that contained the Warning Flyers.

226. A screenshot of an excerpt of the report comparing the handwriting on each document is below:




K1 Q2.2

Location of top stroke of "B" (left of vertical stroke), proportions of bowl formations. Note the hesitation mark at the end stroke of letter "n".

***Putting the Pieces Together: Wendy Bloom Facebook Account and Email***

227. Upon information and belief, Brahms and/or Drexler created the Wendy Bloom Facebook account.

228. Upon information and belief, the Wendy Bloom Facebook account was created to harass Ms. Lane and her family.

229. Upon information and belief, Brahms and/or Drexler used the Wendy Bloom Facebook account to harass Ms. Lane and her family.

230. In response to a subpoena to Meta issued in the Nevada Bankruptcy Proceeding, Meta provided the geolocation information for the IP addresses that were used to access the Wendy Bloom Facebook account.

231. The information produced revealed that three of the six IP addresses used to access the Wendy Bloom account were located within 0.5 miles of the offices of Mae Capital LLC located at 15 Putnam Avenue, Greenwich, Connecticut.

232. Upon information and belief, Brahms impersonated Wendy Bloom and posted the April 4, 2024, Wendy Bloom Facebook post.

233. Upon information and belief, Brahms impersonated Wendy Bloom and sent the Wendy Bloom email to the Westport Board of Education on April 14, 2023.

***Putting the Pieces Together: The Harassing Websites***

234. Upon information and belief, Brahms created and/or published and/or maintained and/or funded the publication of Harassing Website 1 and Harassing Website 2.

235. Upon information and belief, Drexler directed the creation of and/or funded the publication of Harassing Website 1 and Harassing Website 2.

236. Upon information and belief, Drexler knowingly benefitted from Brahms' creation, maintenance, and/or publication of Harassing Website 1 and Harassing Website 2.

237. Upon information and belief, the Harassing Websites were created by Brahms with the intent to harass, terrorize, and alarm Ms. Lane, and for no legitimate purpose.

238. Sklar knowingly provided Brahms with Ms. Lane's private information that was displayed on Harassing Website 1 and Harassing Website 2.

239. Upon information and belief, Sklar was aware that the information she provided to Brahms was to be used for the purpose of harassing Ms. Lane.

240. Upon information and belief, Sklar provided Brahms with false information concerning Ms. Lane's family for the purpose of harassing her.

241. Sklar falsely stated to Brahms that Ms. Lane's husband was expelled from a country club called the Patterson Club.

242. Sklar also admitted that besides sharing this information, she also shared other information that appeared on the Harassing Websites including claims that Mr. Lane had a dispute with an elderly neighbor.

243. Tellingly, this information made its way to Harassing Website 1 and Harassing Website 2.

244. A screenshot of the portion of the Harassing Websites that publishes this false information is below:

> Another FACT: **Ryan Lane was recently expelled from the Patterson Club in Fairfield.** It's no surprise he's no longer on the member list, considering his ongoing belligerent behavior, chronic intoxication, disrespectful treatment of staff, arrogance, and superiority complex.

245. A screenshot of the text message from Sklar to Brahms is below with the text messages from Brahms aligned to the right, and the text messages from Sklar aligned to the left:




246. In this text exchange, Brahms communicates to Sklar that her sending this information to Brahms means "a lot of money potentially for my friend."

247. Upon information and belief, the friend Brahms is referring to is Drexler.

248. Sklar also provided Brahms with the picture of Ms. Lane and her three minor children that was published on Harassing Website 1 and Harassing Website 2.

249. Ms. Lane kept her Facebook page private.

250. Ms. Lane was Facebook friends with Sklar.

251. Ms. Lane posted a picture of her family, including her three minor children, on Facebook only for her friends to view.

252. In or around February 2022, Sklar copied this picture and sent this picture of Ms. Lane, her husband, and her three minor children under the age of 13 to Brahms, a convicted felon.

253. Sklar did not seek the consent of Ms. Lane, nor did she otherwise have permission to copy the picture or transmit the picture.

254. Sklar impermissibly transmitted this photo of Ms. Lane, Mr. Lane, and their three minor children to Brahms despite knowing that Brahms harbored animosity toward the Lanes.

255. Moreover, Sklar lied to Ms. Lane during the phone conversation mentioned in paragraphs 156 through 164, stating that she did not share the photo of her family, when in reality she did.

256. Immediately prior to sending this photo of Ms. Lane and her minor children to Brahms, Brahms had described Mr. Lane, a person Brahms had never met, to Sklar as a "complete jerk."

257. The Harassing Websites also published the contents of a private email that Ms. Lane sent to organizers of the 2023 Pink Aid event concerning the donation of the use of her vacation home.

258. The Harassing Websites state that although the Lanes' donation of the use of their home "appear[s] charitable" a "leaked email revealed a different story."

259. The Harassing Websites state that Ms. Lane put restrictions on the donation to "prevent it being rented to so-called 'riff raff,' all while securing a tax deduction. Hush-hush."

260. Ms. Lane only transmitted the email concerning her vacation home to two individuals, one of which was co-chair of the 2023 Pink Aid event, Sklar.

261. Sklar provided the content of the email to Brahms.

262. Sklar admitted that she thought the privacy requests in the email painted an unflattering picture of the Lanes.

263. Sklar admitted that she viewed the restrictions has overly controlling and consistent with Brahms' earlier characterization of Mr. Lane.

264. On or about September 8, 2023, Brahms sent Drexler the contents of the email that Sklar forwarded him about the vacation home.

265. Immediately after forwarding the text, Brahms states to Drexler: "Do not use this in any court docs or let them know you have it. Only 6 people received this text so she will be able to figure it out. Don't kill the source."

266. Sklar is "the source," not only for the auction email but for several pieces of information used to harass Ms. Lane.

267. On or about February 26, 2023, Brahms sent Drexler text messages of:

(a) A picture of Ms. Lane and her husband and three minor children, identical to those on the Harassing Websites;

(b) A screenshot of Google information for Taratino Restaurant & Bar in Westport, Connecticut, which was the same restaurant referenced on the Harassing Websites related to an incident involving Ms. Lane's husband.

268. On or about March 16, 2023, Brahms received a text message from Drexler with a screenshot from instantcheckmate.com which included information about Ms. Lane's husband's record related to the incident at Tarantino Restaurant that was the result of a severe health issue that Ms. Lane experienced while dining at the restaurant.

269. Sklar admitted that she told Brahms about the incident, which she had "heard" about from others. Because the incident was dismissed and expunged, there was no public record.

270. Below is a screenshot of the image that Drexler sent to Brahms:




***Putting the Pieces Together: Surveillance of Ms. Lane's Home***

271. Brahms and/or Brahms' wife surveilled and recorded video footage of Ms. Lane's house and her child inside of the house.

272. Ms. Lane lives in a private community.

273. The street Ms. Lane lives on, Manitou Road, is a private, circular road.

274. The portion of Manitou Road on which Ms. Lane lives does not connect to any other street.

275. The street Ms. Lane lives on displays signs indicating that it is a private road.

276. The signs state: "PRIVATE," "NO TRESPASSING," and "RESIDENTS AND GUESTS ONLY."

277. A picture of the signs at the entrance of Ms. Lane's street is below:







278. On or about March 23, 2023, Brahms sent a text message to Drexler stating, "Text me [Ms. Lane's husband's] home address. I'm in Westport for dinner and want to drive by."

279. Drexler responded with a link to Ms. Lane's home address.

280. A video shows Brahms and his wife, Emily Brahms, driving into Ms. Lane's driveway, turning around, and viewing Ms. Lane's minor child through the window.

281. Brahms and his wife did not have a legitimate reason to be on Manitou Road.

282. Brahms opens the video by saying "alright Ry[an]," indicating that he is taking the video for Ryan Drexler.

283. As Brahms drives down Ms. Lane's street, he approaches the house and pulls into the driveway, simultaneously stating "let's pull in the driveway and turn around, shall we?"

284. Brahms pulls into the driveway as the recording continues, and the GPS announces, "the destination is on your left, 14 Manitou Road." Brahms then states on the video: "At least we know where it is."

285. Brahms then records one of Ms. Lane's children through a window of the home and exclaims "there's a kid running up the stairs!"

286. Upon information and belief, Brahms sent this video to Drexler.

287. A screenshot from the video, which shows Ms. Lane's house in clear view, is presented below:



***Putting the Pieces Together: Pink Aid Public Humiliation***

288. Drexler, Brahms, and Sklar coordinated the public service of the Subpoena on Ms. Lane at the Pink Aid event on October 24, 2024, for the purpose of embarrassing her.

289. Text messages obtained from the process server, Rubin, and a production from Brahms' cell phone reveal that Brahms, Drexler, and Sklar each played integral parts in carrying out the scheme to serve Ms. Lane in public with a Subpoena for the purpose of embarrassing and harassing her (hereinafter "Subpoena Scheme").

290. On or about October 23, 2024, Nicoletti & Harris, a process service company, received a rush order to serve Ms. Lane with a subpoena at the Pink Aid event at Mitchell's Department store.

291. Tellingly, the process service order form included the same picture of Ms. Lane and her family that was published on the Harassing Websites (i.e. the picture Sklar provided to Brahms of Ms. Lane and her family).

292. The instructions on the order form indicated that Drexler was the contact person and included the following instructions: "Mitchell Department store. Amy is going to be setting up for an event between 12-5p. 'Pink After Dark' CT Annual Event & Fashion Show – Pink Aid 'Personal [sic] Only.'"

293. Sklar, the 2023 Pink Aid event co-chair, texted Brahms that the best time to ensure Ms. Lane was served at the 2024 Pink Aid event was just before the event started.

294. Brahms is personal friends with the owner of Nicoletti & Harris.

295. Brahms put Drexler in direct contact with Nicoletti & Harris and instructed Drexler to say that he was referred by Richie Eisen, the owner of the service company.

296. Upon information and belief, this allowed Drexler to bypass and coordinate service without involvement of his attorney.

297. A group text message between Brahms, Drexler, and the process server, Rubin, shows the following:

(a) Brahms indicated that he specifically wanted Ms. Lane to be served during the charity event. Specifically, Rubin inquired, "Let me know the exact time you want me in the parking lot. Thank you and see you later."

(b) Brahms responded, indicating that "I think you should be there around 5:45-6:00 before the event opens. She will be inside Mitchell's preparing for the

event that opens at 6:30. After 6:30, you will need a ticket to enter so you will have a small window. She will be inside, not in the parking lot."

(c) Brahms indicated that they were pursuing service of process during the Pink Aid fundraiser, even though the parties were aware of Ms. Lane's home address. In fact, Brahms had previously driven to Ms. Lane's house and video recorded it.

(d) Brahms sent a photo of Ms. Lane and noted that Ms. Lane was "Short about 5'3," indicating that he had seen Ms. Lane, even though Ms. Lane has never met Brahms.

(e) Rubin replied by noting that she was aware of where Ms. Lane lived, noting that "I've seen her at her house because I've served her husband." Indeed, Ms. Lane had accepted service on behalf of her husband from Rubin related to litigation involving Drexler less than a year prior to this event.

(f) Drexler later asked the process server if he could "videotape it," indicating that he wanted the service of process on Ms. Lane to be recorded.

(g) Brahms noted he is a friend of both Drexler and the owner of the process server company ("I'm just a friend of the client Ryan and Richie Eisen who owns the company we contacted to hire you") and that he was "loving this."

(h) Rubin replied by indicating, in sum and substance, that he could not videotape it ("unfortunately, I cannot videotape it. I'm not equipped with anything except my cellphone").

(i) Drexler persisted with the request ("Is it illegal to have your iPhone recording while you do it? Or in your pocket facing her while it's on record?").

298. Later, at approximately 5:32 p.m., Rubin confirmed to Drexler and Brahms that he was at the event ("I'm here"). The conversation continued with the following highlights, indicating their joy and excitement at the possibility of embarrassing Ms. Lane:

(a) Drexler wanted to know if the event was busy ("Is it busy? I am told it is"), and Rubin asked whether he should proceed with service ("There are people with suits at the door looks like a photographer, ballet police officers. Do you want me to go in and attempt to server [sic] myself or should I wait?").

(b) Brahms and Drexler responded, noting that they wanted to wait until the event was busier. Specifically, Brahms stated, "It starts at 6:30 so maybe wait until 6 or a bit later? . . . After 6:30 it will require a ticket to enter. . . . They are setting up now. Ideally Ryan would love for you to serve her in front of as many people as possible [smiley face emoji]." Drexler confirmed ("Yes").

(c) Later, after Rubin confirmed that he had effectuated process ("She was just served in hand on the stage"), Brahms responded, "NO SHIT!" and Drexler stated, "wow amazing." Rubin clarified that Ms. Lane was on the microphone ("She was on the microphone. Practicing"), and Drexler repeated his pleasure ("amazing thanks eric").

(d) Brahms followed up by asking questions to get more details about the circumstances regarding the service for his own perverse enjoyment, stating: "Well Done! PERFECT. . . It was meant to be . . . Did a lot of people see you do it? How many people were in there? Eric, was the place filled with people? Did any people see you serve her? DO TELL [smiley face emoji]."

299. Below are screenshots of the text messages mentioned in the previous paragraph:




300. Sklar has admitted that she informed Brahms that Ms. Lane would be present at the Pink Aid event.

301. Below is the text sent from Sklar to Brahms with information on Amy's anticipated location on the day of the Pink Aid event:




***Putting the Pieces Together: The Harassing Events Coincide with Events in the Bankruptcy***

302. The harassing events described in the paragraphs above coincide with events in the Nevada Bankruptcy Proceeding involving Ms. Lane's husband.

303. On December 15, 2022, Debtor filed Chapter 11 Bankruptcy.

304. On January 3, 2023, Debtor filed a motion to approve DIP financing from a private equity firm, White Winston, which Drexler supported. Within days, the Debtor decided to accept financing from Empery, much to Drexler's disapproval.

305. On January 9, 2023, the Court approved Empery's DIP financing on an interim basis. Drexler then tells White Winson that he has a "plan."

306. On February 8, 2023, the day before the first harassing event, the call to the Westport Board of Education, Drexler brought a complaint against Empery in the Eighth Judicial District Court of Nevada, Case No. A-12-865375-C.

307. On February 9, 2023, the Bankruptcy Court approved Empery's DIP Proposal, over Drexler's opposition.

308. On February 17, 2023, Ms. Lane received the Poison Pen Letter.

309. On March 2, 2023, Drexler sued an employee of Empery in Washoe County Nevada. A few weeks later, on March 24, 2023, the case is removed and successfully dismissed.

310. The next day, on March 25, 2023, the Wendy Bloom email account was created.

311. On April 1, 2023, Ms. Lane's neighbors received the Warning Flyers.

312. On April 4, 2023, the Wendy Bloom Facebook account was created.

***U.S. Bankruptcy Court, District of Nevada, Enters TRO, Quashes Subpoena to Ms. Lane, Grants Attorneys' Fees***

313. As a result of the above-mentioned harassment, on or about November 14, 2024, the U.S. Bankruptcy Court, District of Nevada, entered a restraining order, ECF 1262, (the "Temporary Restraining Order") which among other things, found that:

(a) "The continued harassment has caused injury to, and will continue to cause injury to Mr. and Mrs. Lane and their family by causing significant fear and distress, for which no adequate remedy at law exists."

(b) "The Court finds that the balance of harms weighs in favor of Empery and the Lanes as Drexler is not entitled to harass parties and witnesses in this proceeding and therefore, Drexler will not be harmed in being enjoined from continuing harassment."

314. The Temporary Restraining Order further states that:

"IT IS HEREBY ORDERED THAT Drexler, his officers, agents (including Eric Brahms), servants, attorneys, or anyone else acting in concert with him are hereby enjoined from:

1. Harassing or intimidating Empery, any witness in the case, their families or agents, and expressly including Mr. and Mrs. Lane and their family;

2. Coming within twenty (20) miles of the Lanes' residences in Westport, Connecticut or Park City, Utah, which addresses shall be provided to counsel for Drexler;

3. Coming within a reasonable distance of Empery's corporate offices located in New York, except with respect to Drexler's attorneys currently appearing in this case;

IT IS FURTHER ORDERED THAT Drexler, his officers, agents (including Eric Brahms), servants, or anyone else acting in concert with him are hereby directed and ordered to remove the websites ryanlanewestport.com and ryanmatthewlane.com;

IT IS FURTHER ORDERED THAT this temporary restraining order shall continue for a period of fourteen days from the day of issuance;

IT IS FURTHER ORDERED THAT this temporary restraining order shall be further continued beyond fourteen days for good cause showing, through and including December 6, 2024, which good cause is demonstrated by the Court's and parties' unavailability, and which continuation is subject to further extension by order of the Court for good cause shown;

IT IS FURTHER ORDERED THAT this temporary restraining order shall be served on Ryan Drexler and Eric Brahms as soon as reasonably possible…."

315. On or about January 13, 2025, the Court entered judgment that quashed the Subpoena issued by Drexler on Ms. Lane. ECF 1460. In that Order the Court stated that the "Subpoena is herby QUASHED and no materials should be produced in response to the Subpoena

nor is any appearance necessary." The Order further directs Ms. Lane's counsel to file a declaration regarding attorneys' fees she incurred in connection with the motion to quash.

316. On or about October 6, 2025, the U.S. Bankruptcy Court, District Nevada ordered Drexler pay for Ms. Lane's attorneys' fees in connection to her motion to quash the subpoena.

317. To date, Drexler has not paid this court ordered amount.

***Westport PD Opens an Investigation, Requests a Sworn Statement from Sklar, and Ultimately Determines that there is Probable Cause to Arrest Brahms, Drexler, and Sklar***

318. Beginning in April 2023, Ms. Lane started reporting the instances of harassment to the Westport Police Department ("Westport PD").

319. Detective John Lauria began investigating shortly thereafter, but Defendants' concerted efforts to conceal their identities caused the investigation to stall. That changed in late 2024, when the discovery of the Deleted Text Messages supplied the information necessary for Detective Lauria to continue and advance the investigation.

320. Upon information and belief, as part of that continued investigation, Detective Lauria asked to speak with Sklar.

321. Upon information and belief, Sklar refused to speak with the Westport PD, and rather had two attorneys and a private investigator meet with the Westport PD.

322. Sklar ultimately submitted a sworn statement to the Westport PD, dated May 5, 2025, along with a letter from her attorney, in which she admitted to sending Brahms pictures of the Lanes, including the family photograph that appeared on the Harassing Website, with knowledge that Brahms' friend had a dispute with Ryan Lane.

323. Sklar also admitted to telling Brahms about Ryan Lane's Tarantino Restaurant incident, which appears on the Harassing Websites, and which is otherwise not publicly available information.

324. Sklar further admitted to sending Brahms the email that Ms. Lane sent concerning the donation of her Deer Valley home, details of which appear on the Harassing Websites.

325. Sklar moreover admitted to providing information to Brahms that he used to perpetuate unlawful service of Ms. Lane at the Pink Aid event.

326. Sklar's statement also acknowledged that she had previously viewed the Harassing Websites—with all the sensitive, private information that she had provided.

327. All these admissions flatly contradict Sklar's previous assurances to Ms. Lane and Mr. Gladstein, described in paragraphs 143 through 164, that she did not communicate with Brahms about the Lanes, much less send sensitive information about the Lanes to Brahms for purposes of facilitating harassment.

328. Sklar's admissions further confirm that she knew the sensitive, private information she provided Brahms was used to harass Ms. Lane and her family, yet she did not attempt to get the Harassing Websites taken down or otherwise help Ms. Lane and her family after Mr. Gladstein contacted Sklar and/or after Sklar spoke to Ms. Lane in November 2024.

329. Prior to the Subpoena Scheme, several key pieces of information regarding the harassment were missing. After the Subpoena Scheme, the Westport PD had probable cause to issue a warrant for the arrest of Brahms, Drexler, and Sklar for the following crimes:

- CGS 53a-183: Harassment in the 2nd Degree
- CGS 53a-48/53a-183: Conspiracy to Commit Harassment in the 2nd Degree

- CGS 53a-181: Breach of Peace in the 2nd Degree
- CGS 53a-48/53a-181: Conspiracy to Commit Breach of Peace in the 2nd Degree
- CGS 53a-181d: Stalking in the Second Degree
- CGS 53a-48/53a-181d: Conspiracy to Commit Stalking in the 2nd Degree

330. On or about July 15, 2025, the Westport PD issued a warrant for the arrest of Brahms, Drexler, and Sklar.

331. Each of the arrest warrants were over fifty pages long.

332. The Office of the State's Attorney declined to prosecute the criminal charges, citing the applicable statute of limitations, and the purported availability of civil remedies. However, because intentional infliction of emotional distress claims carry significant discovery burdens, and because no civil cause of action for harassment adequately address all of the circumstances described above, Ms. Lane's civil remedies are limited.

333. In denying Ms. Lane's email request for a meeting to understand the prosecutor's decision to decline to press formal charges, the prosecutor wrote to Ms. Lane that "[o]ften times people who engage in that type of behavior know the line and while they will walk right up to it, they do not cross it."

334. When Ms. Lane responded to that email questioning how two years of documented stalking could be within any permissible line, the prosecutor forwarded the email to a Captain of the Westport PD, noting that Ms. Lane's comment about "two years of stalking" was "news to me," notwithstanding her prior assurances that she read the lengthy arrest warrants which outlined, in detail, the stalking and harassment campaign against Ms. Lane and her family.

335. When made aware of these facts, the prosecutor stated that the case "may require follow up," but deferred that decision to a colleague.

**COUNT ONE: STALKING (Violation of Conn. Gen. Stat. § 52-571l)**
**(As to Brahms and Drexler)**

336. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

337. Brahms and Drexler violated Conn. Gen. Stat. § 53a-181d(b)(3).

338. Brahms and Drexler for no legitimate purpose and with intent to harass, terrorize and alarm, by means of electronic communication disclosed Ms. Lane's personally identifiable information without her consent on the Harassing Websites.

339. Among other personally identifying information, Brahms and Drexler published on the public websites Ms. Lane's: name, prior legal name, maiden name, month and year of birth, phone number, address, and prior addresses.

340. Brahms and Drexler made this disclosure knowing, that under the circumstances, such disclosure would cause a reasonable person to fear for their physical safety and suffer emotional distress.

341. Brahms and Drexler made this disclosure on the Harassing Websites, which were two websites dedicated to embarrassing, harassing, and stalking Ms. Lane and her family.

342. The Westport PD determined that there was probable cause that Brahms and Drexler violated Conn. Gen. Stat. § 53a-181d and issued warrants for their arrests.

343. Drexler knowingly benefitted from the stalking of Ms. Lane.

344. Brahms stated that obtaining information to support the harassment and stalking campaign "means a lot of money for my friend," and upon information and belief, that "friend" was Drexler.

345. Brahms and Drexler knew or should have known that the stalking of Ms. Lane was in violation of Conn. Gen. Stat. § 53a-181d(b)(3).

346. The harassment campaign caused Ms. Lane emotional distress and fear for her physical safety and the safety of her family.

**COUNT TWO: ABUSE OF PROCESS (As to Brahms)**

347. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

348. Brahms organized, directed, and/or implemented the Subpoena Scheme that was executed on October 24, 2024.

349. Brahms devised a plan to embarrass and harass Ms. Lane through the use of the Subpoena.

350. Subpoenas are not designed to harass and/or embarrass individuals.

351. Upon information and belief, Drexler and Brahms took control of service of the Subpoena from Drexler's attorneys.

352. Brahms is personal friends with the owner of Nicolleti & Harris, Inc. ("Nicolleti & Harris") a process serving and litigation support service company.

353. Brahms worked with Nicolleti & Harris to coordinate service.

354. The Nicoletti & Harris Work Order form indicates the following:

(a) The priority is "RUSH"

(b) Special instructions include: "Mitchell Department store. Amy is going to be setting up for an event between 12-5pm. 'Pink After Dark' CT Annual Event & Fashion Show – Pink Aid 'Personal [sic] Only'"

355. Attached to the Work Order form is a cropped version of the family picture displayed on the Harassing Websites.

356. Nicoletti & Harris assigned the job to Connecticut Process Serving, LLC.

357. Service was then assigned to the process server, Rubin.

358. As detailed in paragraphs 297 through 299 above, Drexler and Brahms texted with Rubin to ensure the service was embarrassing and harassing.

359. These text messages show that the primary purpose of the Subpoena was to embarrass and harass Ms. Lane.

360. Among other things, Brahms:

(a) Expressed his enjoyment of the service;

(b) Asked for Rubin to "serve her in front of as many people as possible [smiley face emoji];"

(c) Asked Rubin if he could film Ms. Lane being served.

361. The Subpoena had no legitimate purpose.

362. As explained in paragraphs 93 to 97, Ms. Lane had no involvement in the Nevada Bankruptcy Proceeding.

363. Ms. Lane's attorney and Drexler's attorney spoke the morning the Subpoena was served regarding the Subpoena, and Drexler's attorney did not mention service of the Subpoena.

364. When questioned by Ms. Lane's attorney as to the relevance of the deposition, Drexler's attorney simply stated it was "personally important" to Drexler.

365. The Subpoena was eventually quashed, and Ms. Lane was not required to appear for her deposition.

366. The Subpoena Scheme caused Ms. Lane to feel humiliated.

367. The Subpoena Scheme caused Ms. Lane emotional distress and reputational harm, and Ms. Lane was otherwise damaged.

**COUNT THREE: FALSE LIGHT (As to Brahms)**

368. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

369. Upon information and belief, Brahms created, published, and/or maintained the Harassing Websites.

370. On December 4, 2024, Brahms admitted to Ms. Lane's attorney that he published and/or had control over the Harassing Websites.

371. After Brahms' December 4, 2024, deposition in which he perjured himself he agreed to take down the Harassing Websites.

372. The following day, on December 5, 2024, the Harassing Websites were taken down.

373. The Harassing Websites contained various false and damaging statements about Ms. Lane and her family.

374. The Harassing Websites were published on the internet and were publicly available through Google.

375. The Harassing Websites were readily discoverable by anyone performing a simple internet search of Ms. Lane's or her husband's name or their home address, so numerous individuals encountered the websites when trying to find Ms. Lane's address or other basic information about her or her family, including but not limited to the following instances:

(a) While Ms. Lane was hosting Pink Aid volunteer meetings at her home, volunteers searching online for her address—simply to know where the volunteer meetings were hosted—were presented with the Harassing Websites in the search results.

(b) During a vacation with a group of friends, one friend typed Ms. Lane's husband's name into an AI-powered search tool, and a Harassing Website immediately populated in the presence of the group, causing Ms. Lane embarrassment and distress.

(c) Ms. Lane's Pink Aid co-chair later admitted, after months of working together, that she searched Ms. Lane's name after being paired together, viewed the website, found it strange, but politely refrained from asking about it—which was humiliating to Ms. Lane.

(d) A childhood friend contacted Ms. Lane out of concern after searching for the Lanes's home address and consequently discovering a Harassing Website.

(e) The father of a friend to Ms. Lane's son found a Harassing Website while merely searching for the address from which to pick up his child, and he expressed his concern for the Lanes, further compounding Ms. Lane's embarrassment and distress.

376. Among other things, the Harassing Websites state that Ms. Lane was abused by her husband both privately and publicly, stating "[Mr. Lane] verbally abuses his wife and children both privately and publicly."

377. This statement is false.

378. The statement is highly offensive to a reasonable person.

379. Among other things, the Harassing Websites falsely suggest that Ms. Lane is elitist and not charitable, stating that restrictions were put on the auction of their vacation home to prevent it being rented to "so-called 'riffraff', all while securing a tax deduction. Hush-hush."

380. This statement is false.

381. The statement is highly offensive to a reasonable person.

382. This statement is such a major misrepresentation of Ms. Lane's history that serious offense may reasonably be expected to be taken by a reasonable person in her position.

383. Brahms had knowledge of or acted in reckless disregard as to the falsity.

384. Brahms intended to harass and embarrass Ms. Lane by publishing this false information.

385. As a result of the publication of the false statement, Ms. Lane has suffered damages, including but not limited to severe emotional distress, mental distress, and reputational harm.

**COUNT FOUR: INTRUSION UPON SECLUSION (As to Brahms)**

386. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

387. Brahms intruded on the privacy of Ms. Lane.

388. Brahms intentionally sought out to invade Ms. Lane's privacy by driving to her house, filming the drive, driving his car into her driveway, and filming her house.

389. Brahms sent a text message to Drexler asking for Ms. Lane's address.

390. The GPS in Brahms' car announces that his destination was Ms. Lane's address, 14 Manitou Road.

391. As explained further in paragraphs 271 through 287, Ms. Lane lives on Manitou Road, which is in a private community, on a private road which does not connect to other streets.

392. As such, Ms. Lane has a reasonable expectation of privacy in her home.

393. There are two signs displayed at the entrance of Manitou Road. The signs state: "PRIVATE," "NO TRESPASSING," and "RESIDENTS AND GUESTS ONLY."

394. Brahms had no legitimate purpose for being on Manitou Road.

395. Brahms and/or his wife filmed Ms. Lane's house.

396. As Brahms is turning into the driveway, he exclaims: "There's a kid running up the stairs!"

397. The child Brahms is referring to is Ms. Lane's son, who was 10 years old at the time.

398. The intrusion was a part of Brahms' and Drexler's campaign to harass Ms. Lane.

399. Brahms' interference with Ms. Lane's seclusion is highly offensive.

400. A reasonable person would strongly object to Brahms' intrusion on Ms. Lane's privacy and seclusion.

**COUNT FIVE: VIOLATIONS OF RICO, 18 U.S.C. § 1962(c) (As to Drexler and Brahms ("RICO Defendants"))**

401. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

402. The RICO Defendants—Drexler and Brahms—acting through an enterprise (either Mae Capital LLC or as an association-in-fact enterprise), engaged in a coordinated scheme spanning at least two years, involving repeated acts of mail fraud, wire fraud, obstruction of justice, and witness tampering. These acts were not isolated incidents but rather part of a continuous pattern designed to pressure Ryan Lane and Empery Asset Management and to inflict financial harm on Amy Lane. The enterprise's activities included interstate communications, financial transactions, and the use of internet-based platforms, all of which affected interstate commerce. As a direct and proximate result of these racketeering acts, Plaintiff incurred substantial attorneys' fees, security expenses, and other financial losses.

403. 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

404. Each RICO Defendant at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because each RICO Defendant can hold, and does hold, "a legal or beneficial interest in property."

405. Mae Capital is a RICO enterprise through which the RICO Defendants facilitated and funded their illegal racketeering acts. Mae Capital was formed in 2012 and is ongoing and continuing.

406. The RICO Defendants also formed an association-in-fact enterprise as an informal group linked together for a common purpose of influencing the Nevada bankruptcy, functioning as a network to commit the predicate acts listed below. The members of the association-in-fact enterprise share longstanding personal and financial ties, as set forth above in Paragraphs 166 through 183. This association-in-fact enterprise lasted over two years, culminating in the service of Amy Lane at the Pink Aid event.

407. Through these enterprises, the Defendants engaged in a pattern of racketeering because they engaged in at least two related acts of "racketeering activity" within a 10-year period. These included obstruction of justice (18 U.S.C. § 1503), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1344), and witness tampering (18 U.S.C. §§ 1512, 1513):

(a) Brahms obstructed justice as set forth in 18 U.S.C. § 1503 because he endeavored to influence, obstruct, and impede the due administration of

justice in the Nevada Bankruptcy Proceeding by committing perjury and attempting to spoliate evidence in the Nevada Bankruptcy Proceeding relating to the motion to quash, as set forth in Paragraphs 184 through 206, above.

(b) Each RICO Defendant also obstructed justice as set forth in 18 U.S.C. § 1503 because he endeavored to influence, obstruct, and impede the due administration of justice in the Nevada Bankruptcy Proceeding by waging a harassment and humiliation campaign against Ms. Lane in an effort to manipulate her husband, Ryan Lane, and Empery into agreeing to terms more favorable to MusclePharm in the Nevada Bankruptcy Proceeding, as set forth in Paragraphs 19 through 127, above.

(c) Drexler committed mail fraud as set forth in 18 U.S.C. § 1341 by making material misrepresentations regarding Ms. Lane's husband in the Poison Pen letter, sent to Ms. Lane across state lines through use of the mails in order to obtain a financial benefit in the form of terms more favorable to MusclePharm in the Nevada Bankruptcy Proceeding, as set forth in Paragraphs 25 through 30, above.

(d) Drexler committed mail fraud as set forth in 18 U.S.C. § 1341 by making material misrepresentations regarding Ms. Lane's husband in the Warning Flyers, sent to Ms. Lane's neighbors across state lines through use of the

U.S. Postal Mail in order to obtain a financial benefit in the form of terms more favorable to MusclePharm in the Nevada Bankruptcy Proceeding, as set forth in Paragraphs 32 through 37, above.

(e) Brahms and Drexler committed wire fraud as set forth in 18 U.S.C. § 1344 by making material misrepresentations in the Harassing Websites through use of the internet to obtain a financial benefit in the form of terms more favorable to MusclePharm in the Nevada Bankruptcy Proceeding, as set forth in Paragraphs 60 through 87, above.

(f) Defendants indirectly threatened, intimidated, or retaliated against witnesses including Ms. Lane and Mr. Lane through this pattern harassment, with the intent of influencing or hindering their testimony both in the Nevada bankruptcy and in the SEC investigation of Mr. Drexler, in violation of 18 U.S.C. §§ 1512, 1513.

408. Because there were more than two acts of racketeering within 10 years, the RICO Defendants' conduct constitutes a "pattern" of racketeering activity. 18 U.S.C. 1961(5).

409. Each RICO Defendant's participation was crucial to the racketeering activity.

410. Each RICO Defendant was involved in the orchestration, planning, preparation, and execution of the scheme to improperly influence the Nevada Bankruptcy Proceeding to obtain a favorable financial recovery.

411. RICO Defendants' conduct affected interstate commerce because:

(a) the Poison Pen letter and Warning Flyers were sent across state lines;

(b) the Harassing Websites were available on the internet;

(c) their actions were intended to improperly influence the Nevada Bankruptcy Proceeding;

(d) at all relevant times, Drexler resided in California or Nevada, while conspiring and communicating across state lines with Connecticut resident Brahms; and

(e) Drexler and Brahms funded and facilitated RICO Defendants' illegal actions through interstate wire transfers from Connecticut corporation Mae Capital to California and/or Nevada resident Drexler.

412. As a result of RICO Defendants' actions, Ms. Lane has suffered damages including hiring personal security, retaining cybersecurity consultants, and incurring attorneys' fees.

413. Ms. Lane's property interests have been injured by, and as a direct and proximate result of, RICO Defendants' violations of 18 U.S.C. § 1962(c). Because of the violations of 18 U.S.C. § 1962(d), Ms. Lane is entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

**COUNT SIX: VIOLATIONS RICO, 18 U.S.C. § 1962(d) (As to Drexler and Brahms ("RICO Defendants"))**

414. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

415. In violation of 18 U.S.C. § 1962(d), RICO Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) in that they knowingly agreed and conspired to participate in, directly or indirectly, the affairs of an enterprise through the pattern of racketeering activity described above. The racketeering activity could not have occurred without the consent and knowing collusion of each RICO Defendant.

416. As part of, and to advance, their conspiracy, RICO Defendants agreed to and conspired in the commission of the predicate acts described above, with knowledge that those acts were in furtherance of the pattern of racketeering activity.

417. As set forth above, each RICO Defendant agreed to and did commit at least two predicate acts of racketeering.

418. As a result of RICO Defendants' actions, Ms. Lane has suffered damages including hiring personal security, retaining cybersecurity consultants, and incurring attorneys' fees incurred in the Nevada Bankruptcy Proceeding.

419. Ms. Lane's property interests have been injured by, and as a direct and proximate result of, RICO Defendants' violations of 18 U.S.C. § 1962(d). Because of the violations of 18 U.S.C. § 1962(d), Ms. Lane is entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amy Lane respectfully requests that the Court:

(a) Enter judgment in favor of Plaintiff and against Defendants on all causes of action;

(b) Award Plaintiff compensatory damages against Defendants;

(c) Award Plaintiff treble damages, pursuant to RICO, 18 U.S.C. § 1964;

(d) Award punitive damages and exemplary damages;

(e) Award reasonable attorneys' fees and costs;

(f) Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action; and

(g) Direct such further relief it may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

THE PLAINTIFF,
AMY LANE

By *Sandra Marin Lautier*

Benjamin Daniels (29713)
Sandra Marin Lautier (29886)
Robinson & Cole LLP
One State Street
Hartford, CT 06103
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299
E-mail: bdaniels@rc.com;
slautier@rc.com